IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DAVID JONES and SUSAN JONES,

    Plaintiffs,

       v.

INFOCURE CORP., et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:01-CV-2845-TWT

## OPINION AND ORDER

This is a securities fraud action.  It is before the Court on the Motion for Summary Judgment of Defendants Richard E. Perlman and James K. Price [Doc. 212], the Plaintiffs' Motion for Partial Summary Judgment [Doc. 215], and the Motion for Summary Judgment of Defendants InfoCure Corporation and InfoCure Systems, Inc. [Doc. 221].  For the reasons set forth below, Defendants Perlman and Price's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, the Plaintiffs' Motion for Partial Summary Judgment is DENIED, and Defendant InfoCure's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I. <u>BACKGROUND</u>

Defendant InfoCure Corporation n/k/a VitalWorks ("InfoCure") is a national provider of healthcare practice management software products and services to healthcare practice specialties.  It is incorporated in Delaware and was previously headquartered in Atlanta, Georgia.  InfoCure has, since the events in this case, moved its headquarters to Ridgefield, Connecticut and changed its business name to VitalWorks.  Defendant InfoCure Systems, Inc. is a Georgia corporation that, at all relevant times, was a wholly owned subsidiary of InfoCure.  Defendants Richard E. Perlman and James K. Price were directors and officers of InfoCure.  Defendant Perlman served InfoCure as Chairman, Treasurer, and Director.  The InfoCure officers and directors are each citizens of states other than Indiana.

InfoCure was formed to acquire other companies that provided management technology services to healthcare practices.  Consistent with this design, InfoCure did not conduct any significant operations and did not generate any revenues prior to its initial public offering on July 10, 1997, on which date it also acquired four companies.  During the remainder of 1997 and during 1998 and 1999, InfoCure acquired an additional twenty companies, including the Plaintiffs' company.

In 1983, Plaintiffs David and Susan Jones started PRISM Data Systems, Inc. ("PRISM").  The company was engaged in the development, sale, installation, and

support of computer systems for use in the management of ophthalmology practices. Susan Jones served as the Chairman of the Board and Secretary of PRISM, and David Jones served as the company's Vice President and Treasurer.  Prior to December 28, 1999, the Joneses owned approximately 95 percent of the outstanding stock of PRISM.  As a result of their efforts, by the end of 1999, PRISM had approximately fifty employees and generated annual revenues in excess of $4.6 million.

In October 1999, one of InfoCure's officers approached Susan Jones at a trade show and told her that InfoCure was interested in acquiring PRISM.  A few weeks following the trade show, Defendant Price, Executive Vice President and Director of InfoCure at the time, contacted Ms. Jones.  During that telephone call and later, Price negotiated with the Joneses for the acquisition of PRISM.  During the negotiations, the Joneses met and communicated with Defendants Price and Perlman, in addition to other representatives of InfoCure.  The discussions culminated in the parties signing an Agreement and Plan of Merger (the "Merger Agreement") on December 28, 1999. As a result of the merger, the Joneses received approximately 228,000 shares of InfoCure stock with a market value, as of the closing date, of approximately $30 per share.  In turn, the Joneses entered into agreements not to compete with InfoCure, and InfoCure took over the operation of the former PRISM offices in Lebanon, Indiana. Not long after the merger, the value of the Joneses' shares in InfoCure plummeted,

closing, for example, on April 28, 2000, at a value of $9.12 per share.  The Plaintiffs

contend that their losses were caused by fraud on the part of the Defendants.

      A.    <u>Adoption of ASP Subscription Price Model</u>

In the late 1990's, the computer software world was abuzz about the concept of

providing computer software applications on an as-needed, subscription basis.

Instead of buying a license to use the software, the user would access the software on

a server maintained by an Application Service Provider ("ASP").  Infocure wanted to

get into this business.  On December 22, 1999, InfoCure announced its acquisition of

VitalWorks. In its 8-K Report filed on December 22, 1999, InfoCure stated that

"InfoCure will contribute to VitalWorks.com the business of those specialty practices

that are most likely to adopt the ASP model."  The Plaintiffs contend that this

statement suggested, consistent with the Defendants' assurances to the Plaintiffs, that

the main body of InfoCure's business would remain unchanged and that only a portion

of the business would employ the ASP subscription-based model.

On March 30, 2000, as part of its 1999 Form 10-K Annual Report, InfoCure

announced that during the fourth quarter of 1999 it had decided to adopt, almost

exclusively, the ASP subscription pricing model.  InfoCure made this announcement

despite allegedly making contrary representations to the Joneses prior to and in the

Merger Agreement.  The Plaintiffs allege that the change to the ASP subscription

pricing model caused InfoCure to report substantial losses for the fourth quarter of 1999. The pricing model change caused InfoCure to revise the period used to amortize goodwill from fifteen years to three years and thereby write off nearly $29 million of goodwill per year for the new three year period. According to InfoCure's 1999 Form 10-K, the accelerated write-off amounted to a $3.5 million charge for the final six weeks of the 1999 year. The pricing model change also caused InfoCure to revise its estimates of the collectibility of its accounts receivable, contributing an additional fourth quarter 1999 pre-tax loss of $3 million. Finally, in the 1999 Form 10-K, InfoCure reported that, during the last quarter of 1999, it had taken an approximately $10.7 million charge against earnings for restructuring and other costs, and its changes in accounting procedures resulted in a charge against 1999 earnings of $5.6 million.

The Plaintiffs allege that the minutes of an InfoCure Fiscal Planning meeting on or about November 5, 1999, indicate that members of the InfoCure accounting department were concerned that the switch to the ASP subscription pricing model would cause "a sudden financial crisis," and that the predicted financial crisis occurred. Primarily, the Plaintiffs allege, as a result of the foregoing changes, InfoCure's earnings per share dropped from a $0.36 per share profit for the nine

months ending September 30, 1999, to a loss of $0.13 per share for the entire year of 1999.

The Plaintiffs contend that these facts show that on December 28, 1999, the closing date of the merger, the Defendants either knew or reasonably should have known that InfoCure's financial condition had negatively and materially changed over the fourth quarter of 1999.  Specifically, they allege that the change in InfoCure's business model to ASP subscription pricing had caused a material adverse change in InfoCure's business or financial condition since September 30, 1999.  The Plaintiffs allege that the Defendants failed to make any disclosure of any of the above facts or their attendant economic consequences, rather affirmatively representing the contrary to the Joneses in the Merger Agreement.

The Plaintiffs allege that the Defendants intended to conceal InfoCure's impending shift to a subscription price model in order to disguise the dilution and devaluation of InfoCure stock.  As a result of this allegedly artificial price inflation, the market price of InfoCure stock rose rapidly in late 1999.  Inflation of the stock price enriched InfoCure Officers and Directors, who owned substantial amounts of InfoCure stock and options, and enabled InfoCure to acquire companies much cheaper and for fewer shares.  Specifically, with respect to PRISM, as the number of shares of InfoCure common stock to be received by the Joneses was based upon the average

closing price of InfoCure stock for the twenty days before the merger.  An increase in the price over this twenty-day period meant a decrease in the number of InfoCure shares the Joneses would receive.  The closing price of InfoCure common stock increased from $14.37 on December 3, 1999, to $32.94 (nearly an all-time high) two days before the merger.  As a consequence of this price increase, the Joneses received significantly fewer shares of InfoCure common stock on December 28, 1999, than they would have received had the increase not occurred or been less dramatic.

B.    Datamedic Transaction

In November 1999, InfoCure acquired a corporation known as Datamedic. Datamedic marketed healthcare practice management software.  It had revenues in excess of $20 million.  A merger agreement between Datamedic and InfoCure was announced in September 1999, and the merger closed on November 9, 1999.  As Datamedic's revenues represented more than 10 percent of the combined revenues of the post-merger entity, the Plaintiffs allege that the merger was the acquisition of a "significant subsidiary" under the terms of the SEC's Regulation S-X, 17 C.F.R. § 210.01, *et seq.*  The Plaintiffs contend that, pursuant to Regulation S-X, InfoCure, was required to make and file a retroactive statement of its combined audited financial statements for the preceding three years.  Until the company's financial statements had

been restated on an audited basis for the applicable time periods as required by that regulation, the company's financial statements failed to contain all material disclosures.

The Plaintiffs allege that the Defendants knew in December 1999, during negotiations for and at the closing of the PRISM merger, that InfoCure had yet to publish these required retroactive statements.  Indeed, the Plaintiffs allege that the Defendants deliberately decided not to undertake the restatement after the Datamedic acquisition, supposedly in order to avoid diverting resources from other merger negotiations (including those with PRISM) and business transactions.  The Plaintiffs allege that the Defendants failed to inform them that a restatement was required by law or that, in the absence of a restatement, InfoCure's prior financial statements were materially misleading.  Rather, the Defendants allegedly affirmatively represented the contrary to the Joneses in the Merger Agreement.

With the filing on March 30, 2000, of InfoCure's Annual Report on Form 10-K for the year 1999 and its concomitant disclosure of (1) InfoCure's change in sale and business model to ASP subscriptions, (2) its substantial fourth quarter charges to income, write-offs and other financial adjustments, and (3) its suffering substantial losses for the fourth quarter of 1999 (as opposed to the substantial profits marking the previous nine months), InfoCure's stock price declined rapidly.  As a result, by May 26, 2000, the date on which the first third of the Joneses' InfoCure stock was

registered and could first be sold, InfoCure's stock closed at $4.38 per share.  At that price, the InfoCure stock that the Plaintiffs received in exchange for PRISM was worth approximately $1 million, rather than the $7 million that the Joneses were led to believe they had received at closing.

Moreover, the Plaintiffs allege that, without the Joneses' knowledge or consent, InfoCure used the social security numbers of Susan and David Jones to obtain a line of credit to have phone lines activated for use in InfoCure's Indiana office.  The Joneses allege that they were only made aware that the service had been activated under their names, and that they were being held financially responsible for it, when they were contacted by a collection agency for the unpaid invoices.

The Plaintiffs brought this action in the Superior Court of Boone County in Indiana.  The Plaintiffs asserted claims for breach of contract, fraud, and rescission pursuant to Indiana securities laws.  InfoCure removed the case to the United States District Court for the Southern District of Indiana.  Once in federal court, InfoCure then moved to dismiss the action or, alternatively, to have it transferred to the Northern District of Georgia pursuant to 28 U.S.C. § 1404(a).  The Plaintiffs moved for a preliminary injunction to prevent InfoCure from taking various actions that were allegedly irreparably damaging PRISM, so that the value of the company would be preserved if they succeeded on their claim for rescission.  On October 15, 2001, Judge

John Daniel Tinder of the United States District Court for the Southern District of Indiana denied the Plaintiffs' request for a preliminary injunction, denied the Defendants' motion to dismiss, and entered an order transferring the case to the Northern District of Georgia. The Plaintiffs appealed to the United States Court of Appeals for the Seventh Circuit which affirmed the district court's denial of a preliminary injunction and denied the remainder of the appeal. Jones v. InfoCure Corp., 310 F.3d 529 (7th Cir. 2002). The action was then transferred here.

After the action was transferred to the Northern District of Georgia, the Plaintiffs, following changes in counsel, twice moved for leave to amend their complaint. [Docs. 102, 118]. This Court granted each of these motions, the second of which was unopposed by the Defendants. [Docs. 106, 119]. In their Second Amended Complaint, the Plaintiffs assert claims against Defendant InfoCure and individual Defendants Perlman and Price for common law fraud, violations of the Georgia Securities Act, O.C.G.A. § 10-5-12(a), and the Georgia RICO Act, O.C.G.A. § 16-14-4(a) & (c). They also assert claims against Defendant InfoCure for breach of contract and civil theft. The Plaintiffs also seek a declaratory judgment that the agreements not to compete are unenforceable and seek recovery of attorneys' fees. The Defendants move for summary judgment on all of the Plaintiffs' claims. The

Plaintiffs move for partial summary judgment on liability as to their claim for breach of contract.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

### A.  Breach of Contract

The Plaintiffs assert a claim for breach of contract against Defendant InfoCure, alleging that InfoCure breached the terms of the PRISM Merger Agreement.  Specifically, the Plaintiffs allege that InfoCure breached provisions in the Merger Agreement warranting that its SEC reports fairly represented the financial condition of the company (Br. Supp. Pls.' Mot. Partial Summ. J., Ex. A (hereinafter "Merger

Agreement") at ¶ 4.5), that no material adverse suits were filed or threatened against

InfoCure (id. at ¶ 4.6), and that it had no material adverse changes in its business or

financial condition since September 30, 1999 (id. at ¶ 4.5). InfoCure contends that it

did not breach these warranties, and even in the event of breach, that the Plaintiffs

waived their claim for breach by accepting the benefits of the contract.

### 1.   SEC Reports

The Plaintiffs allege that InfoCure breached the Merger Agreement by

misrepresenting the company's financial status in its SEC filings. The Merger

Agreement states, in pertinent part,

> The unaudited financial statement and unaudited interim financial
> statements included in the InfoCure SEC reports have been prepared in
> accordance with GAAP (except as may be indicated therein or in the
> notes thereto and except with respect to unaudited statements as
> permitted by Form 10-Q of the SEC) and fairly present the financial
> condition of InfoCure as of the dates thereof and the results of operations
> and cash flows for the periods then ended, subject, in the case of interim
> financial statements, to normal recurring audit adjustments.

(Merger Agreement at ¶ 4.5.) The Plaintiffs contend that InfoCure's November 9,

1999 acquisition of Datamedic rendered its financial statements, as of the entry into the

Merger Agreement, wholly inaccurate. SEC Regulation S-X governs the submission

of financial statements. See 17 C.F.R. § 210.1-01, et seq. Under Regulation S-X,

Datamedic constituted a "significant subsidiary," as the revenues of Datamedic

represented more than ten percent of the combined revenues of the post-merger entity.

See 17 C.F.R. § 210.1-02(w).  Because of the size of the Datamedic acquisition, applicable securities regulations required InfoCure to restate its financials for the preceding three years to incorporate Datamedic's financial results.  InfoCure was required to issue this restatement before it could file another registration statement or Form S-3.

The Plaintiffs contend that until these financial statements were restated, the company's financial statements failed to contain material disclosures and were thus inaccurate.  It does not stand to reason, however, that the decision to restate financials necessarily renders the prior financial statements inaccurate "as of the dates thereof." Nor does the existence of a restatement suggest that prior statements did not "fairly present the financial condition of InfoCure as of the dates thereof," as required by the Merger Agreement.  Indeed, a company's decision to restate its financials does not amount to an admission that the previous filings were misleading.  See Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1020 n.4 (5th Cir. 1996).  This is especially clear where, as here, the company makes its intent to restate its financials public. InfoCure disclosed its plan to restate its financial statements in the S-4 filed on September 27, 1999:

> We intend to account for the Merger as a pooling-of-interests business combination . . . . [T]he operating results of the combined company will include operating results for the entire fiscal year in which the Merger is completed and our historical reported operating results for prior periods

13

will be combined and restated as the operating results of the combined company.

(D. Jones Dep., Ex. 66 at 4.)  InfoCure's restatement of its financials on March 30, 2000, does not alone demonstrate that its prior SEC filings, which gave notice of the planned restatement, do not "fairly present the financial condition of InfoCure as of the dates thereof."   Thus, the Plaintiffs' claim for breach of contract through misrepresentations in SEC filings is without merit.  Summary judgment on this claim for InfoCure is warranted.

2.    Adverse Suits

The Plaintiffs assert a second claim for breach of contract, alleging that InfoCure breached the Merger Agreement by failing to disclose outstanding claims against InfoCure to the Plaintiffs during the merger negotiations.   The Merger Agreement states, in pertinent part:

> Except as may be disclosed in the InfoCure SEC Reports, there are no suits, arbitrations, actions, claims, complaints, grievances, investigations or proceedings pending or, to the Knowledge of InfoCure or ISI, Threatened against InfoCure or ISI that, if resolved against InfoCure or ISI could be reasonably expected to have a material adverse effect on InfoCure or ISI on their ability to consummate the Merger and the other transactions contemplated hereby.

(Merger Agreement at ¶ 4.6.)  The Plaintiffs suggest that InfoCure did not disclose its failure to register shares issued in connection with other acquisitions, about which litigation had, at the time of the Prism merger, allegedly been threatened.  These suits,

14

the Plaintiffs allege, had material adverse effects on both the financial status of InfoCure and the Plaintiffs' willingness to accept unregistered shares of InfoCure stock.  The Plaintiffs fail, however, to show that these potential claims had any effect on the parties' "ability to consummate the Merger and the other transactions contemplated hereby."   The provision that the Plaintiffs assert is breached is specifically limited to claims reasonably expected to jeopardize the parties' ability to execute the merger.  Although the Plaintiffs understandably conclude that information about these potential claims may have affected their *intent* to merge with InfoCure, they cannot rationally argue that these claims had any discrete effect on the parties' *ability* to consummate the merger.  Summary judgment for InfoCure on this claim is proper.

### 3.   Material Adverse Changes

The rubber meets the road in the Plaintiffs' claim that InfoCure breached the Merger Agreement by failing to acknowledge material adverse changes to its business and its financial condition between September 30, 1999, and the date of the merger. In the Merger Agreement, InfoCure warranted that:

> Since September 30, 1999, there has been no material adverse change in the assets, liabilities, results of operations, financial condition, business or prospects of InfoCure and its subsidiaries taken as a whole, and there are no existing facts or circumstances known to the senior management of InfoCure reasonably likely to create a material adverse change, other

than with respect to general domestic or international economic conditions.

(Merger Agreement at ¶ 4.5.)  The Plaintiffs contend that, in the fourth quarter of 1999, InfoCure decided to make significant changes to both its business structure and business model.  Most notably, InfoCure decided to shift from a traditional software-license based model to an Application Service Provider model.  As InfoCure outlined later in its Form 10-K for 1999:

> In the fourth quarter of 1999, InfoCure decided to restructure its business into a medical and a dental division, changed its product strategy to begin development of ASP-delivered products and Internet solutions, decided to transition to a subscription pricing model in connection with its change in product strategy, and completed eight acquisitions, including five acquisitions which substantially increased its presence in the dental market.  Concurrently, management committed to a plan of restructuring and reorganization, expected to be completed in the second quarter of 2000, to consolidate facilities, eliminate staffing redundancies and position InfoCure to capitalize on its change of business model.

(Br. Supp. Pls.'s Mot. Summ. J., Ex. B at 25.)  Under the ASP model, customers access remote programs through a telephone line or the Internet.  Rather than paying a single lump sum for software, consumers are charged a fixed monthly fee for a "subscription" to the software programs.  The Plaintiffs contend that this shift in business model, a shift that InfoCure admits it contemplated in the warranted period, constituted a material adverse change in InfoCure's business and caused material adverse changes to InfoCure's financial condition and business prospects.  Moreover,

the Plaintiffs contend that the senior management at InfoCure knew or should have known that the change to an ASP model was likely to create a material adverse change to InfoCure's financial status.   For these reasons, the Plaintiffs contend InfoCure breached the warranties it made in the Merger Agreement.

There is no real dispute as to whether there was a change in InfoCure's "assets, liabilities, results of operations, financial condition, business or prospects" between September 30, 1999, and the date of the merger.   The areas of genuine dispute are whether the changes were "material" and whether the changes were conclusively "adverse."   These terms have different meanings depending upon the context of their use.  In criminal law, undisclosed evidence may be deemed "material" if it "might have affected the outcome of the trial."   United States v. Bagley, 473 U.S. 667, 682 n.12 (1985).  In ordinary, less precise language, the term "material" is often taken to mean "significant" or "essential."   Black's Law Dictionary 998 (8th ed. 2004).   And in securities law, the term describes information which would be of importance in making an investment decision.   Id.; see also Basic Inc. v. Levinson, 485 U.S. 224, 240 (1988).

The Merger Agreement fails to define the term "material."   The Plaintiffs encourage the Court to accept the definition of materiality outlined in Basic Inc. v. Levinson, 485 U.S. at 240, as "of significance to a reasonable investor."   Giving

texture to this definition, the <u>Basic</u> Court describes a fact as material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." <u>Basic</u>, 485 U.S. at 230-31.  This latter definition necessarily implies that in order to alter the mix of information available to a reasonable investor, that information must not already be available to or known by that investor.[1]  Thus, any changes about which a reasonable investor in the Plaintiffs' position would have been aware are not considered "material" and are not warranted by the Merger Agreement.

InfoCure argues that the changes cited by the Plaintiffs, although significant, are not material, as they were known to the Plaintiffs at the time of the merger and were, by definition, already part of the "total mix of information" available to them at that

---

[1]The Plaintiffs have attempted to recast this issue as whether a claim for breach of an express warranty may have a reliance component.  Citing the cases suggesting that courts have eschewed such a requirement as blurring the line between tort and contract, <u>see, e.g.</u>, <u>Southern Broadcast Group, LLC v. GEM Broadcasting, Inc.</u>, 145 F. Supp. 2d 1316, 1321 (M.D. Fla. 2001); <u>CBS Inc. v. Ziff-Davis Publ'g Co.</u>, 553 N.E.2d 997, 1001 (N.Y. 1990), the Plaintiffs conclude that their (and, by extension, a reasonable investor's) knowledge at the time of the merger is irrelevant to their claims for breach.  Here, however, InfoCure is not arguing that reliance on the warranted information is required to establish a claim for breach of warranty.  InfoCure merely argues that *this* warranty, qualifying the warranted changes as "material," only protects against changes about which reasonable investors in the Plaintiffs' position would not have known.  The concern is not with the general elements of a claim for breach of warranty, but with the specific elements of the warranty that the Plaintiffs allege was breached.

time.  Specifically, InfoCure contends that the changes deemed material by the Plaintiffs were made known to the public through its SEC filings and that any financial effects of these changes that occurred in 2000 were not known to be likely to happen until that time.

The term "adverse" also presents problems in interpretation.  Of particular importance to this litigation is whether actions which have negative short-term consequences but long-term gains can be considered conclusively "adverse." Corporations often engage in restructuring in an effort to produce long-term gains. Here, InfoCure contends that the shift to an ASP model, although allegedly causing short-term financial problems, may still provide long-term gain for the corporation and its shareholders.

In the Merger Agreement, InfoCure warranted that there were no material adverse changes in its business between September 30, 1999, and the date of the PRISM merger.  As discussed above, during the fourth quarter of 1999, InfoCure decided to shift a significant portion of its business from a traditional software model to an Application Service Provider ("ASP") model.  To facilitate the ASP model, InfoCure also adopted a subscription-based pricing system.  InfoCure recognizes that these shifts in business model and pricing structure constituted significant changes to

its business.  It contends, though, that the Plaintiffs knew about these changes at the time of the merger, rendering the changes immaterial.

As evidence that the Plaintiffs knew or should have been aware of the shift to an ASP model, InfoCure cites a press release filed with its Form 8-K on December 23, 1999.  Lauding a partnership effort with Hewlett-Packard Company and Qwest Communications International, Inc., InfoCure announced that "they are working together to enable InfoCure to offer its VitalWorks practice management software as an Application Service Provider (ASP) to physicians and healthcare practices."  (Br. Supp. Pls.' Mot. Partial Summ. J., Ex. K at 12.)  The press release further explained that InfoCure "anticipate[d] that the majority of its current and new customers will opt for the VitalWorks e-service within the next few years."  (Id.)  The Plaintiffs contend that this press release did not disclose or otherwise suggest that InfoCure would transfer all of the assets of its medical division to VitalWorks and offer "substantially all of its products and services" through the ASP model and subscription pricing.  (Id., Ex. B at 24.)  Rather, the Plaintiffs contend that InfoCure executives represented and they understood that the ASP model would be offered only as an option to select customers in specialty practices.  (See id., Ex. K at 4 ("InfoCure will contribute to VitalWorks.com the business of those specialty practices that are most likely to adopt the ASP model."); see also D. Jones Dep. at 79; S. Jones Dep. at 59; Pl. D. Jones'

Supp. Resp. Defs.' First Interrogs. at 7.)  Consequently, the information available to the Plaintiffs, they maintain, suggested that InfoCure's ASP practice would be introduced gradually and would not pose a significant change to InfoCure's corporate structure or risk to its financial health.  As there remains a genuine issue of material fact as to whether reasonable investors in the Plaintiffs' position would have been aware of the nature and magnitude of the change in InfoCure's business, summary judgment on this claim for either party is inappropriate at this time.

Moreover, there appears to be genuine dispute as to whether the change was adverse.  Although no objective observer could suggest that the immediate financial ramifications of the change to an ASP model were positive, the long-term value of this business shift remains an open question.  Thus, the question of whether there has been an adverse change in the *business of InfoCure*, as opposed to the financial condition of the company, remains open and prevents summary judgment on this claim.

In the Merger Agreement, InfoCure warranted that there were no material adverse changes in its "assets, liabilities, results of operations, [and] financial condition" between September 30, 1999, and the date of the Prism merger.  The Plaintiffs contend that, due to its switch to an ASP model and attendant restatement of financials, InfoCure's financial status severely worsened in the last quarter of 1999. For the quarter ending December 31, 1999, InfoCure suffered a net loss of $4.0

million, not including the effects of $13.8 million of nonrecurring charges.  (Pls.' Br. Supp. Mot. Partial Summ. J., Ex. N at 1.)   Contributing to these losses was an operating loss in excess of $18 million for the fourth quarter of 1999.  (Id., Ex. R at 4.)  Including the nonrecurring charges, InfoCure sustained a net loss of $12.2 million or $0.39 per diluted share for the quarter ending December 31, 1999.  (Id., Ex. N at 2.) Citing the substantial losses InfoCure incurred in the fourth quarter of 1999, the Plaintiffs allege that InfoCure breached its warranty against any material adverse change in its financial condition.

InfoCure contends that the Plaintiffs' evaluation of the fourth quarter results and comparison with prior quarters do not fairly represent the financial condition of InfoCure at that time.   Relying on Pacheco v. Cambridge Technology Partners (Massachusetts), Inc., 85 F. Supp. 2d 69 (D. Mass. 2000), InfoCure argues that a quarter-to-quarter comparison is inappropriate and immaterial as a matter of law. Pacheco, 85 F. Supp. 2d at 75.   Rather, InfoCure suggests that "[a]bsent some evidence that sequential comparison is especially probative for [the defendant's] business line, the ordinary comparison is year-over-year."   Id. (citing Capri Optics Profit Sharing v. Digital Equip. Corp., 950 F.2d 5, 10 (1st Cir. 1991)).  Here, however, it appears that the language of the warranty suggests a sequential comparison.  The provision states that there had been no material adverse change "since" September 30,

1999, the end of the third quarter, as of the date of the merger, near the end of the fourth quarter.  (Merger Agreement at ¶ 4.5.)  It appears that InfoCure provided the warranty in lieu of financial data for its fourth quarter.  Excluding nonrecurring charges, InfoCure had a net income of $2.0 million in the fourth quarter of 1998 but experienced a net loss of $4.0 million in that same quarter of 1999.  The marked decrease in InfoCure's 1999 fourth quarter income, as compared both to the previous fourth quarter and the first three quarters of 1999, suggests that there may have been an adverse change in InfoCure's operations and financial condition.

InfoCure contends that any change in its financial status was not so significant as to be considered "material."  InfoCure's Rule 30(b)(6) representative testified that when reviewing quarterly financials to assess a company's financial condition, one must factor out the unusual and non-recurring expenses that occur in a given quarter. (Cochran Dep. at 122-23.)  Consequently, he concluded that there was no material adverse change in InfoCure's financial condition in the fourth quarter of 1999.  (Id. at 123.)  Although a long-term view of InfoCure's financial status may be appropriate, InfoCure's Merger Agreement with the Plaintiffs warrants more than simply a stable financial status.  The agreement also bars any material adverse change in InfoCure's assets, liabilities, and results of operations.  Unusual and non-recurring expenses do have a significant impact on InfoCure's assets and liabilities.  Although these expenses

may be factored out in assessing InfoCure's financial health, they cannot be factored out in evaluating InfoCure's balance sheet. As the Merger Agreement also warrants against changes in InfoCure's assets, liabilities, and results of operations, evidence of significant non-recurring expenses is not, as Cochran would suggest, irrelevant to a determination of breach.

InfoCure also contends that even if there was an adverse change in its financial condition, any such change was immaterial. Just as InfoCure alleges that the Plaintiffs knew or should have known about the changes in InfoCure's business at the time of the merger, it argues that the Plaintiffs knew or should have known the effects that the change in business model would have on InfoCure's financial status. InfoCure insists that the Plaintiffs were aware of the potential financial ramifications of a switch to an ASP model. (See D. Jones Dep. at 82, 92-93 (noting Jones' belief that ASP models were risky and speculative).) Thus, InfoCure concludes, the impact of this change is immaterial. Again, although this line of argument is more strained, it appears that there remains a genuine issue of fact as to whether the Plaintiffs were aware of changes in InfoCure's financial status, rendering these changes immaterial.

InfoCure also warranted that there were no material adverse changes in its "prospects of InfoCure and its subsidiaries taken as a whole" between September 30, 1999, and the date of the PRISM merger. Citing evidence of declining revenues and

reduced cash flow in the months following the switch to an ASP model, the Plaintiffs contend that the "risky" move from software to application services significantly harmed both InfoCure's present business and its future prospects. InfoCure's own official statements suggest that it considered its adaptation to an ASP model the source of its financial struggles in fiscal year 2000. InfoCure's Form 10-Q for the quarter ending September 30, 2000, states:

> The reduction in cash flow from operations during the nine months ended September 30, 2000 [negative $7.6 million] as compared to cash provided by operating activities of approximately [positive] $5.1 million for the nine months ended September 30, 1999 is due primarily to the impact of our ongoing change in business model, including the transition to subscription-based pricing and the anticipated future release of our ASP applications and some customers making purchases in 1999 to prepare for Year 2000 issues.

(Br. Supp. Pls.' Mot. Partial Summ. J., Ex. T at 17.) Indeed, InfoCure did not realize a quarterly profit using the ASP model until fiscal year 2002.

Again, as InfoCure alleges that it revealed its impending switch to an ASP model in press releases attached to its Form 8-K, filed on December 22, 1999, the company contends that the Plaintiffs were aware or should have been aware of the change in business model. Consequently, InfoCure concludes, if this switch damaged InfoCure's future prospects, the Plaintiffs should have been as cognizant of this potentially adverse change as the Defendants. Indeed, the Plaintiffs have testified that they were familiar with the ASP concept and considered implementation of an ASP

model "risky."  (D. Jones Dep. at 82, 92-93.)  If a reasonable investor in the Plaintiffs' position would have known of the change in business model and its impact on future prospects, then any adverse change is immaterial.  As there remains a genuine issue of material fact as to whether reasonable investors in the Plaintiffs' position would have been aware of the impact of the change in InfoCure's business or InfoCure's financial prospects, summary judgment on this claim for either party is inappropriate at this time.

Moreover, InfoCure's short-term financial struggles, even if attributed to the transition to subscription services, do not necessarily compel the conclusion that the change in business model adversely changed InfoCure's future prospects at the time of the PRISM merger.   Indeed, evaluation of a company's prospects inherently requires a long-term view of company strategy.  Here, InfoCure, as it revealed in December 23, 1999 press release, thought that its business shift would provide it a "first-mover advantage" and place it in a "tremendous position with its new ASP strategy."  (Br. Supp. Pls.' Mot. Partial Summ. J., Ex. K at 12-13.)  When viewed in light of InfoCure's growth strategy, it is not unreasonable to recognize both that the short-term economic impact of the ASP model is negative and that the projected long-term benefits of the transition, at the time of the merger, were significantly positive.  The Court cannot conclude as a matter of law that the switch to an ASP model caused

or failed to cause a material adverse change to InfoCure's prospects at the time of the PRISM merger. Thus, summary judgment on this claim for either party is improper at this time.

### 4. Damages

InfoCure seeks dismissal of the Plaintiffs' breach of contract claim based on the Plaintiffs' failure to prove damages. Actual damages, however, are not an essential element of a claim for breach of contract. See O.C.G.A. § 13-6-6; Botterbusch v. Preussag Int'l Steel Corp., 271 Ga. App. 190, 195 & n.15 (2004); Belcher v. Thomson Newspapers, Inc., 190 Ga. App. 466, 467 (1989). "In every case of breach of contract the injured party has a right to damages, but if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action." O.C.G.A. § 13-6-6. As actual damages and, consequently, loss causation, are not elements critical to a claim for breach of contract, summary judgment on the claim for failure to prove these elements is not proper.

### 5. Waiver

InfoCure contends that the Plaintiffs have waived their right to sue for breach of warranties in the Merger Agreement. They offer two distinct arguments for waiver: (1) that the Plaintiffs knew that the warranties were false but elected to proceed with the merger; and (2) that the Plaintiffs failed to rescind the agreement, instead continuing

to accept benefits under the agreement.  Where, as here, the subject agreement contains an express non-waiver provision, neither of these arguments is valid.

Under Georgia law, a party to a written contract may waive the right to pursue a claim under the contract by intentionally relinquishing that right through words or conduct.  See, e.g., Universal Mgmt. Concepts, Inc. v. Noferi, 270 Ga. App. 212, 215-16 (2004); Leeuwenburg v. Clark, 228 Ga. App. 615, 616 (1997).  But "the law will not infer the waiver of an important contractual right unless such waiver is clear and unmistakable."  Noferi, 270 Ga. App. at 216 & n.14 (citing Croxton v. MSC Holding, Inc., 227 Ga. App. 179, 183 (1997)).  Here, the text of the Merger Agreement bears on the issue of waiver.  See Southern Broadcast Group, LLC v. Gem Broadcasting, Inc., 145 F. Supp. 2d 1316, 1324-25 (M.D. Fla. 2001), aff'd, 49 Fed. Appx. 288 (11th Cir. 2002).  The Merger Agreement states: "To the maximum extent permitted by applicable law, no claim or right arising out of this Agreement or the documents referred to herein can be discharged by one party hereto, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party hereto. . . ."  (Merger Agreement at ¶ 9.3.)  Applying similar law concerning waiver to similar provisions in an asset purchase agreement, the United States District Court for the Middle District of Florida held that "these provisions suggest that [the plaintiff] preserved its breach of warranty claim by the terms of the Agreement."  Southern

28

Broadcast Group, 145 F. Supp. 2d at 1324.  An otherwise viable waiver defense is defeated where the contracting party expressly preserves its right to enforce the agreement.  Id. at 1326 (citing Rogath v. Siebenmann, 129 F.3d 261, 264 (2d Cir. 1997)).  Here, it appears that the Plaintiffs expressly preserved their right to enforce the warranties in the Merger Agreement.  Any waiver of this right must have been, like the Plaintiffs' written preservation of the warranty, clear and unmistakable.

InfoCure contends that the Plaintiffs' signature of a Rule 144 letter in conjunction with their sale of InfoCure stock must be construed to effect a waiver.  In the Rule 144 letter, the Plaintiffs alleged that they were not privy to any then-undisclosed material adverse information about InfoCure's then-current operations prior to selling their stock.  This admission is not tantamount to a waiver of their claims for breach of warranty.  Setting aside the likely solution that information undisclosed to the market at the time of the merger had come to light by the time of the Rule 144 letter, the letter would not be and is not the express written waiver of claims required to defeat the preservation clause of the Merger Agreement.  The Court is thus unable to conclude, as a matter of law, that the Plaintiffs have waived their right to sue InfoCure for breach of warranty.

B.    Fraud

The Plaintiffs assert claims against all Defendants for both securities fraud under the Georgia Securities Act, O.C.G.A. § 10-5-12(a), and common law fraud. Claims brought under the Georgia Securities Act and claims for common law fraud require similar elements. See Keogler v. Krasnoff, 268 Ga. App. 250, 254 (2004); William Goldberg & Co., Inc. v. Cohen, 219 Ga. App. 628 (1995). To assert a claim of securities fraud under O.C.G.A. § 10-5-12(a), a plaintiff must show "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury." GCA Strategic Investment Fund, Ltd. v. Joseph Charles & Assocs., Inc., 245 Ga. App. 460, 464 (2000); see also Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1281 (11th Cir. 1999). To assert a claim of common law fraud, a plaintiff must show: "(1) a false representation; (2) scienter; (3) intention to induce [the plaintiff] to act or refrain from acting; (4) justifiable reliance by [the plaintiff]; and (5) damages to [the plaintiff]." Pendley Quality Trailer Supply, Inc. v. B & F Plastics, Inc., 260 Ga. App. 125, 126 (2003). As the elements in dispute are common to the two fraud claims, they may be considered jointly.

### 1. Misstatements or Omissions

It is clear that causes of action both for common law fraud and for securities fraud require a plaintiff to show that the defendant made an actionable misstatement or omission. Here, the PRISM Merger Agreement contained a valid merger clause. "As

30

a matter of law, a valid merger clause executed by two or more parties in an arm's length transaction precludes any subsequent claim of deceit based upon pre-contractual representations." First Data POS, Inc. v. Willis, 273 Ga. 792, 796 (2001). Consequently, this Court has held that the Plaintiffs' claims for fraud are limited to representations made within the Merger Agreement.  This holding applies not only to those oral representations attributed to InfoCure, but also pre-contractual representations made by Price and Perlman in their capacity as principals and directors of InfoCure.  See Guernsey Petroleum Corp. v. Data General Corp., 183 Ga. App. 790, 791-92 (1987) (barring fraud claim against defendant corporate officer where plaintiff affirmed contract containing merger clause); see also Fann v. Mills, 248 Ga. App. 460, 464 (2001); GCA Strategic Investment, 245 Ga. App. 460, 463 (2000).[2] Price and Perlman may be held responsible for statements made within the Merger

---

[2]The Plaintiffs contend that the GCA Strategic Investment case supports their contention that the merger clause only bars reliance on extra-contractual statements made by the *parties to the contract* and, thus, does not bar suit against  Price and Perlman for their alleged oral misrepresentations.  In GCA Strategic Investment, as here, a stock purchase agreement governing the purchase contained a merger clause. The purchaser of GCA stock sued the seller, the seller's general partners, the general partners' principals, and the broker.  The Court of Appeals held that the merger clause operated to defeat all claims against the seller, but not against the broker, a wholly separate entity.  GCA Strategic Investment, 245 Ga. App. at 463.  Importantly, the Court did not distinguish between the contracting party and its principals in applying the merger clause.  It follows that the Plaintiffs are no more entitled to rely on the pre-contractual statements of InfoCure's principals, Perlman and Price, than those directly attributed to InfoCure.

Agreement.   Price and Perlman contend that they are not "control persons" of InfoCure and, thus, may not be held responsible for misrepresentations made by the corporation.   Under the Georgia Securities Act, "control person" status is but one of numerous bases for individual liability for corporate actions.   See O.C.G.A. § 10-5-14(c).   The Act also imposes joint and several liability on any "general partner, executive officer, or director" of a corporation liable under the Act.   Id.   An officer or director may avoid liability by showing that "he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist."   Id.   It is undisputed that Price and Perlman were executive officers and directors of InfoCure during the time that the PRISM Merger Agreement was executed.   Neither Price nor Perlman has presented evidence sufficient to demonstrate that he did not and should not have known that the warranties in the Merger Agreement were false.   Pursuant to the Georgia Securities Act, these individual Defendants shall be liable jointly and severally with InfoCure for any violations of the Georgia Securities Act stemming from the alleged misrepresentations in the Merger Agreement.

The Plaintiffs cite as fraudulent numerous warranties outlined in the Merger Agreement.   Specifically, the Plaintiffs allege that the Defendants misrepresented InfoCure's condition by stating that its SEC reports fairly represented the financial

condition of the company (Merger Agreement at ¶ 4.5), that no material adverse suits were filed or threatened against InfoCure (id. at ¶ 4.6), and that it had no material adverse changes in its business or financial condition since September 30, 1999 (id. at ¶ 4.5). These warranties are also the subject of the Plaintiff's claims for breach of contract. As discussed in more detail above, neither InfoCure's warranty about its SEC reports nor InfoCure's averment that no adverse suits would threaten the consummation of the merger constitutes a misrepresentation. There remain genuine issues of material fact as to whether InfoCure's warranty against material adverse changes in its business or financial condition constitutes a misrepresentation. Consequently, the Plaintiffs' fraud claims are limited to this warranty against material adverse changes.

        2.    <u>Scienter</u>

Under Georgia law, scienter is a necessary element of both common law fraud and securities fraud. <u>Keogler</u>, 268 Ga. App. at 254. Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." <u>Id.</u> at 255 (quoting <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n.12 (1976)). A court may find scienter based upon severe recklessness, but even this finding must be accompanied by a determination that the defendant intended to deceive. <u>Id.</u>; <u>see also</u> <u>Petzelt v. Tewes</u>, 260 Ga. App. 802, 805 (2003) ("[A] reckless representation of facts as true when they

are not, if intended to deceive, is equivalent to a knowledge of their falsehood *even if the party making the representation does not know that such facts are false*.") (emphasis in original).  A finding of severe recklessness in the context of fraud must be based upon "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care. . . ."  <u>GCA Strategic Investment</u>, 245 Ga. App. at 464 (quoting <u>Bryant</u>, 187 F.3d at 1281).  The Plaintiffs contend that InfoCure and its representatives made InfoCure's warranties against material adverse changes to its business, prospects, and financial condition with either knowledge or reckless disregard of their falsity.

It is undisputed that the senior management of InfoCure knew at the time of the PRISM merger that InfoCure would begin to shift to an ASP and subscription pricing model.  InfoCure disclosed its plans to move toward an ASP model in a press release filed in conjunction with its Form 8-K on December 23, 1999.  (Br. Supp. Pls.' Mot. Partial Summ. J., Ex. K at 12-13.)  This disclosure militates against finding that InfoCure intended to deceive the Plaintiffs by warranting against a material change in its business.  The Plaintiffs submit no evidence suggesting that InfoCure intended to hide its shift in business model from them.  Indeed, as InfoCure had publicly

announced this shift, any suggestion that it was concealing the move from the Plaintiffs fails.

The closer question is whether the management of InfoCure was aware--or recklessly unaware--of the financial ramifications of their business shift and attempted to conceal these figures from the Plaintiffs until the PRISM merger was consummated. As discussed previously, the Plaintiffs' expert contends that InfoCure management could not help but realize that its shift in business model and change in pricing structure would have a substantial bearing on InfoCure's financial status. The affidavits of InfoCure management state that they believed the ASP model to be the future of the industry and that the accounting decisions relating to goodwill, depreciation of assets, and its pooling-of-interest transactions were not made until 2000--after the PRISM merger. These statements, even if true, do not foreclose the possibility that InfoCure management recognized a decline, even if temporary and necessary, in its financial condition during the fourth quarter of 2000. If the Defendants suggest that InfoCure took one step back to make two leaps forward, then even if the "step back" was thought to be temporary, the warranty against any such material adverse change is a known misrepresentation. There remains a genuine issue of material fact as to whether the Defendants knew that the financial condition of InfoCure had declined in the fourth quarter and as to whether InfoCure intended to

deceive the Plaintiffs with its warranty against such change.  Consequently, summary judgment on this claim for lack of scienter is not appropriate.

       3.    <u>Reliance</u>

Justifiable reliance is a critical element of any claim for common law fraud or securities fraud.  <u>See</u> <u>William Goldberg & Co.</u>, 219 Ga. App. at 637.  Plaintiffs seeking to prove common law fraud must show that they "exercised due care to discover the fraud."  <u>GCA Strategic Investment</u>, 245 Ga. App. at 464.  To demonstrate securities fraud, plaintiffs must show that "with the exercise of reasonable diligence, [they] could not have discovered the truth behind the fraudulent omission or misrepresentation."  <u>Id.</u>  In plain and indisputable cases, absence of justified reliance may support a grant of summary judgment on either species of fraud claim.  <u>See</u> <u>William Goldberg & Co.</u>, 219 Ga. App. at 637; <u>Gibson v. Home Folks Mobile Home Plaza, Inc.</u>, 533 F. Supp. 1211, 1216 (S.D. Ga. 1982).

However, whether an investor or purchaser's reliance is reasonable is ordinarily a question for a jury.  <u>Smiley v. S & J Invs., Inc.</u>, 260 Ga. App. 493, 499 (2003); <u>Ambrose v. Sheppard</u>, 241 Ga. App. 835, 837 (2000).  The Plaintiffs have presented evidence that they reviewed InfoCure's publicly available financial statements, reviewed articles about InfoCure, visited InfoCure offices, and asked numerous questions of InfoCure management concerning InfoCure's business and finances.  At this stage, the

Court cannnot weigh the parties' evidence as to reasonable reliance – it is enough to say that the Plaintiffs have met their light evidentiary burden to submit this issue of fact to a jury.  Summary judgment on the Plaintiffs' fraud claims based on lack of justifiable reliance would be improper.

> ### 4.    Causation

To prevail on their fraud claims, the Plaintiffs must demonstrate that the Defendants' alleged misrepresentations caused their financial loss.  In the securities context, this causation element has two components, both of which must be alleged and proven: transaction causation and loss causation.[3]  Robbins v. Koger Props. Inc., 116 F.3d 1441, 1447 (11th Cir. 1997) (citing Bruschi v. Brown, 876 F.2d 1526, 1528 (11th Cir. 1989)).  Transaction causation is the causal link between a defendant's misconduct and the plaintiff's decision to purchase the security.  Id.; see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d

---

[3]The Court of Appeals for the Eleventh Circuit has bifurcated the causation element of Rule 10b-5 fraud claims into transaction causation and loss causation.  See Robbins, 116 F.3d at 1447; Bruschi, 876 F.2d at 1528.  The Plaintiffs contend that the causation requirement of a Rule 10b-5 claim is more onerous than the "proximate cause" requirement of common law fraud and Georgia Securities Act claims.  Consequently, they may suggest that the dual requirements of transaction causation and loss causation do not apply to their state law claims.  This is not true.  To establish proximate cause in the context of securities fraud, a plaintiff necessarily must prove both that the fraudulent statement caused him to purchase the security (i.e., transaction causation or reliance) and that the subject of the statement caused the value of the security to decline (i.e., loss causation).

Cir. 2003).  A plaintiff can show transaction causation by showing that, but for the allegedly fraudulent statement, it would not have made the detrimental transaction. Robbins, 116 F.3d at 1447; see also Emergent Capital, 343 F.3d at 197. Here, the Plaintiffs testify that they would not have gone forward with the PRISM merger if they had known of InfoCure's shift in business model or the financial implications of the shift.  See Gerrard v. A.J. Gerrard & Co., 285 F. Supp. 2d 1331, 1345-47 (S.D. Ga. 2003).  As discussed above, there remains a genuine issue of material fact as to whether the change in business model was known to the Plaintiffs and was, thus, material.  Consequently, summary judgment for failure to demonstrate transaction causation is not appropriate at this stage.

The second component of the causation element in a securities fraud case is loss causation.  The Plaintiffs' fraud and securities fraud claims are grounded in Georgia common law and Georgia statute.  The claims are based on a face-to-face securities transaction, as opposed to the general purchase of securities on the open market.  For these reasons, the Plaintiffs contend that they, unlike class action plaintiffs asserting a federal securities claim, need not prove "loss causation."  Instead, they contend that they are required to prove only that the Defendants' misrepresentations proximately caused the Plaintiffs' loss--a burden they argue to be markedly less onerous.  The Supreme Court's recent decision in Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct.

1627 (2005), aids in reconciling the Plaintiffs' contention with existing case law.  In Dura Pharmaceuticals, the Court emphasized the common law roots of the federal cause of action for securities fraud.  Id. at 1632-33.  The Court noted that "[j]udicially implied private securities-fraud actions resemble in many (but not all) respects common-law deceit and misrepresentation actions."  Id. at 1632.  Thus, the Court held that to prove securities fraud, a plaintiff must, as when proving common law fraud, show proximate causation and loss.  Id. at 1632-33.  The plaintiff cannot simply presume loss based on a security's inflated purchase price.  Id. at 1632-33.  "An inflated purchase price," the Court held, "will not itself constitute or proximately cause the relevant economic loss."  Id. at 1631.

The Plaintiffs do not assert a federal claim for securities fraud.  Nonetheless, the Supreme Court's unanimous decision in Dura Pharmaceuticals is instructive in dealing with the Plaintiffs' claims, as the Court appears to have applied the common law fraud requirement of "proximate cause," or a similar concept, to securities fraud claims.  In doing so, the Court held that evidence that a security's purchase price was inflated is not alone sufficient to demonstrate that the defendants' actions proximately caused the purchaser's subsequent loss.  Id. at 1631-32.  The Court recognized that there are many potential intervening events that can cause a security to lose value.  Id. at 1632.

> When the purchaser subsequently resells such shares, even at a lower
> price, that lower price may reflect, not the earlier misrepresentation, but

changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

Id. The Court continued:

Given the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will *sometimes* play a role in bringing about a future loss. It may prove to be a necessary condition of any such loss, and in that sense one might say that the inflated purchase price suggests that the misrepresentation . . . "touches upon" a later economic loss. But, even if that is so, it is insufficient. To "touch upon" a loss is not to *cause* a loss, and it is the latter that the law requires.

Id. (cits. omitted) (emphasis in original). Thus, the Plaintiffs' allegation that the price of InfoCure stock was inflated at the time of the PRISM merger is alone insufficient to show that representations leading to this inflation proximately caused the Plaintiffs' loss.

But the Plaintiffs do not limit their fraud claims to allegations that the stock's purchase price was inflated. And they do not limit their supporting evidence to proof that the InfoCure shares were overvalued. The Plaintiffs offer (1) opinion testimony of forensic accountant Richard Millman and rebuttal expert Stewart Brown, Ph.D, (2) the Plaintiffs' own testimony, (3) public statements by InfoCure and its officers, and (4) independent financial analysts' observations regarding InfoCure, all of which

40

suggest that the subject of the Defendants' alleged misrepresentation, the switch to an ASP model, caused the Plaintiffs' economic loss.

The rebuttal report provided by Stewart Brown, Ph.D. is of significant probative value.  In his report, Dr. Brown uses an event study, the methodology espoused by the Defendants' expert, to determine whether the disclosure of the financial effects of InfoCure's shift to an ASP model caused a decline in the price of InfoCure stock.  Dr. Brown uses a broader event window than the Defendants' expert.  He suggests that leaked information, market delay, and the gap between revealing events (i.e., the announcement of restatement and the publication of restated financials) make a narrow event window inappropriate in this case.  Using the broader window, he concludes that "[t]he precipitous decline in the price of InfoCure's stock beginning in early February 2000 was caused by the disclosure of reduced earnings and reduced earnings expectations primarily but not exclusively due to InfoCure's adoption of the ASP/Subscription Pricing Business Model."  (Brown Report at 1.)

The Plaintiffs submit their own affidavits as evidence that the alleged misrepresentations proximately caused their loss.  Both Susan and David Jones testified that they would not have sold PRISM under the terms contracted if they had known the truth about InfoCure's switch to an ASP model and the financial ramifications of this business shift.  As discussed above, this testimony speaks more

41

to transaction causation (i.e., reliance) than to loss causation.  The Plaintiffs connect the alleged misrepresentation to their decision to consummate the merger, not to the allegedly attendant decline in stock value.  Thus, the Plaintiffs' affidavits have no bearing on the issue of loss causation.

In addition to the Plaintiffs' expert testimony and their own lay testimony, InfoCure's public filings admit a causal connection between its shift in business model and the company's reduced earnings in 2000.  In its Form 10Q for the third quarter of 2000, InfoCure states that its decreased revenue is "primarily a result of the effects of [its] transition to subscription pricing, change in product strategy and reorganization initiatives discussed above."  (Br. Supp. Pls.' Mot. Partial Summ. J., Ex. T at 14.)  InfoCure expected "the transition to a subscription pricing model to continue to adversely impact our cash flow until revenue from subscription fees replaces revenue from software license fees and hardware sales."  (Id., Ex. T at 17.)  And, as the Plaintiffs' expert Dr. Brown notes, "[t]here is a general agreement going back a hundred years of finance theory that there's a relationship between earnings and stock prices."  (Brown Dep. at 107.); see also Commodity Futures Trading Commission v. R.J. Fitzgerald & Co., Inc., 310 F.3d 1321, 1330 (citing the importance of profit potential to a customer's investment decision).  Contemporaneous reports from disinterested financial analysts echo these conclusions.  (Appx. of Exs. to all Pls.'

42

Responsive Brs. Filed Feb. 7, 2005, Ex. 53.)   A CIBC World Markets report dated July 27, 2000, states that "InfoCure stock has declined significantly from its high as a result of its shift to a subscription-based pricing model."  (Id., Ex. 53 at 4-5)  The evidence presented by the Plaintiffs, taken in its totality and construed in the light most favorable to the Plaintiffs, creates a genuine issue of material fact as to causation. Summary judgment on the Plaintiffs' fraud claim is improper.

    C.    Civil Theft

    The Plaintiffs allege that InfoCure used their names and social security numbers to establish phone accounts for use in InfoCure business.  In doing so, the Plaintiffs contend, InfoCure stole the Plaintiffs' credit in violation of Indiana law.  Specifically, the Plaintiffs allege violations of Indiana Code § 35-43-4-2(a), which provides that "[a] person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft."  They also rely upon Indiana Code § 35-41-1-23(a)(8), which defines "property" to include extensions of credit.  A plaintiff seeking civil recovery for a criminal act must prove the elements of the underlying crime.  Here, the Plaintiffs must prove both that InfoCure's control over the property was not authorized and that InfoCure intentionally or knowingly took the property.  See Ind. Code § 35-43-4-2. A person acts "intentionally" if "it is his conscious objective to do so," and acts

knowingly if "he is aware of a high probability that he is doing so."  Ind. Code §§ 35-41-2-2(a) & (b).  Proof of the *mens rea* of criminal theft is required for a claim under the civil recovery statute, as the statute is punitive and shall be  strictly construed.  Manzon v. Stant Corp., 138 F. Supp. 2d 1110, 1116 (S.D. Ind. 2001) (citing NationsCredit Commercial Corp. v. Grauel Enters., Inc., 703 N.E.2d 1072, 1078 (Ind. Ct. App. 1998)).

In late 1999, the Plaintiffs and InfoCure consummated the PRISM merger.  In conjunction with the merger, InfoCure retained the PRISM offices in Lebanon, Indiana and retained the Plaintiffs and certain other former PRISM employees as employees of InfoCure.  In late 2000, InfoCure decided to close the Lebanon offices.  InfoCure permitted employees to continue working from their homes or alternate offices with business equipment and services set up and paid for by the company.  In January 2001, PRISM employee Vanessa Ransom held a meeting to inform employees affected by the office closing about their phone lines.  (Ransom Aff. ¶ 4. & Ex. A)  She told the employees at the meeting that the phone company could not and would not install the lines under InfoCure's name, as these lines would be located in houses and offices not owned or controlled by InfoCure.  (Id. at ¶ 4.)  Rather, the lines would be installed under the employees' respective names, and InfoCure would pay the bills.  (Id.)

Susan and David Jones owned or controlled the office in which InfoCure had telephone service installed.  Consequently, InfoCure set up telephone service in this office under the Plaintiffs' names.  Bills for both the installation of these lines and the telephone charges incurred were sent to InfoCure's Birmingham office for payment. (Hicks Aff. ¶ 6.)  When the Plaintiffs' employment contracts expired in late 2001, neither they nor InfoCure terminated the telephone service.  (Id.)  The telephone charges outlined in the Plaintiffs' claims were incurred in 2002, after the Plaintiffs were no longer working for InfoCure.  (See Second Am. Compl. ¶¶ 80-81 & Ex. E.) Although InfoCure does not believe that it was obliged to pay the charges identified by the Plaintiffs, it has since paid these bills to resolve the matter.

The Plaintiffs have failed to show that they have suffered any damages from the alleged theft.  InfoCure has paid the charges in question.  The Plaintiffs have not identified any damage to their credit or other pecuniary damage as a result of these charges.  (S. Jones Dep. at 116; D. Jones Dep. at 169-70.)  The Plaintiffs cite only the discomfort of being called upon by bill collectors to pay the outstanding balances.  As a plaintiff must suffer a pecuniary loss to recover for criminal property theft under the civil recovery statute, Indiana Code § 34-24-3-1, the Plaintiffs cannot recover on their claim of civil theft.  Summary judgment on this claim for the Defendants is proper.

The Plaintiffs also seek to demonstrate criminal theft as a predicate act of their civil RICO claims. To establish theft as a predicate act for RICO, a plaintiff must prove the elements of the crime of theft. Civil damages are not an element of the crime of theft. Thus, the Plaintiffs' failure to show damages does not alone bar consideration of the alleged crime to bolster the Plaintiffs' RICO claims. The Plaintiffs must, however, demonstrate that the Defendants had the required *mens rea* to commit theft in order to establish the predicate act. Here, the Plaintiffs contend that InfoCure "'knowingly' exercised control over their credit information with the intent to deprive the employees of the use of that credit." (Pls.' Opp. Def. InfoCure and InfoCure Systems, Inc.'s Mot. Summ. J. at 71.) The evidence presented does not suggest that InfoCure ever intended to deprive its employees, including the Plaintiffs, of any of their property. InfoCure merely used the employees' personal information to establish telephone services that allowed the employees to continue working from their homes or offices at InfoCure's expense. Put simply, this is not the stuff of criminal theft. As the Plaintiffs have not presented any probative evidence of criminal intent, the alleged theft under Indiana law cannot constitute a predicate act under Georgia's RICO statute.

D.     RICO

The Plaintiffs allege that the Defendants violated the Georgia RICO statute, O.C.G.A. § 16-14-1, *et seq.* (and, in particular, O.C.G.A. § 16-14-4(a)) by engaging in a pattern of securities fraud, mail fraud, and theft.  In order to recover under the Georgia RICO statute, a plaintiff must show that the defendant obtained, directly or indirectly, an interest in money through a pattern of racketeering activity.  O.C.G.A. § 16-14-4(a).  "A 'pattern' for purposes of the Georgia RICO Act must consist of at least two incidents of racketeering activity."  Faillace v. Columbus Bank & Trust Co., 269 Ga. App. 866, 868 (2004); see also O.C.G.A. § 16-14-3(8)(A).  The Plaintiffs allege theft under the Indiana Code, violation of the Georgia Securities Act, and mail fraud as the predicate acts on which their Georgia RICO claim is based.

1.     Theft

The Plaintiffs allege that the Defendants committed the offense of theft by taking in violation of Indiana Code §§ 35-43-4-2 and 35-41-1-23(a)(8).  Specifically, the Plaintiffs allege that InfoCure used the Plaintiffs' individual names and social security numbers to establish phone accounts for use in InfoCure business.  In doing so, the Plaintiffs contend, InfoCure stole the Plaintiffs' credit in violation of Indiana law.  As discussed above, the Plaintiffs' allegations of theft are without merit.  The Plaintiffs cite no probative evidence of intent to commit theft, an essential element of the predicate

act.  Consequently, the Plaintiffs' allegations of theft do not establish a predicate act for their Georgia RICO claim.

> 2.    Securities Fraud

As discussed at length in a previous section, the Plaintiffs assert claims against all Defendants for violations of the Georgia Securities Act.  The Plaintiffs allege that InfoCure made a material misrepresentation in its Merger Agreement with the Plaintiffs and that this misrepresentation--specifically the representation that InfoCure's financial condition had not materially changed--caused the Plaintiffs significant financial loss.  As set forth above, there remain genuine issues of material fact regarding this securities fraud claim.  Willful violations of the Georgia Securities Act, O.C.G.A. § 10-5-12(a), constitute predicate acts under the Georgia RICO Act.[4]  See O.C.G.A. § 16-14-3(9)(A)(xxi).  If the Plaintiffs are able to demonstrate securities fraud at trial, then such fraud may constitute a predicate act for the Plaintiffs' RICO claim.  Consequently, there remain issues of fact as to whether InfoCure's allegedly fraudulent misrepresentation constitutes a predicate act for the Plaintiffs' RICO claims.

_____

[4]The Supreme Court of Georgia recently held that for a violation of the Georgia Securities Act to be "willful," the perpetrator needs only to have "intended to commit the conduct which is violative of the Act."  Cox v. Garvin, 278 Ga. 903 (2005).  To establish the necessary element of scienter, however, a plaintiff still must show that the defendant intended to deceive.  Keogler, 268 Ga. App. at 254; Petzelt, 260 Ga. App. at 805.

The Plaintiffs contend that, if they are able to prove that the PRISM merger was fraudulent, the fraud constitutes two distinct predicate acts, as the fraud was perpetrated upon Susan and David Jones, two distinct persons with two distinct ownership interests in the acquired corporation. This is an incorrect statement of Georgia law. Evidence showing "two joint victims of one isolated transaction" is not sufficient to establish multiple predicate acts or a pattern of racketeering activity. Emrich v. Winsor, 198 Ga. App. 333 (1991) (noting that if the defendant "induced two investors to participate jointly in a single investment," no pattern of racketeering activity is shown); see also Cobb v. Kennon Realty Servs., Inc., 191 Ga. App. 740, 741 (1989). The securities fraud alleged by the Plaintiffs, although visited upon each of them, is limited to a single transaction and cannot be considered multiple distinct predicate acts for the purpose of the Plaintiffs' RICO claim.

But the Plaintiffs do not rest their RICO claim solely on their allegedly fraudulent transaction with InfoCure. In addition to asserting their own securities fraud claim as a predicate act, the Plaintiffs allege that the Defendants committed multiple additional violations of the Georgia Securities Act in other acquisitions made during the fall of 1999.[5]  Notably, they incorporate the securities fraud claims asserted by shareholders

---

[5]As Price and Perlman were executive officers and directors of InfoCure during the fourth quarter of 1999, they remain jointly liable for InfoCure's violations of the Georgia Securities Act pursuant to O.C.G.A. § 10-5-14(c).

of CDL Healthcare Systems, Inc. ("CDL"), arising out of the merger of CDL and InfoCure, a transaction that closed two days following the PRISM merger. The testimony of Richard Souviron, a CDL shareholder, indicates that InfoCure entered into a merger agreement with CDL that, in many respects, mirrored the PRISM Merger Agreement. (Souviron Aff. ¶¶ 4-7 & Ex. A.) As in the merger agreement with PRISM, InfoCure expressly warranted to CDL shareholders that there had been no material adverse change to InfoCure's business or financial status in the weeks preceding the CDL merger. (See id. at Ex. A, ¶ 4.5 ("Since September 30, 1999, there has been no material adverse change in the assets, liabilities, results of operations, financial condition, business or prospects of InfoCure and its subsidiaries taken as a whole . . . .").) InfoCure also represented that its directors and officers did not know of any pending changes to InfoCure's business or financial status. (See id. ("[T]here are no existing facts or circumstances known to the senior management of InfoCure reasonably likely to create a material adverse change, other than with respect to general domestic or international economic conditions.").) Souviron alleges, in uncontradicted testimony, that he relied on these representations. (Id. at ¶¶ 4-7.) The evidence presented to support the Plaintiffs' Georgia Securities Act claims creates a genuine issue of material fact as to whether InfoCure's warranties were made with scienter and whether the subject of these representations caused the devaluation of InfoCure stock.

50

Thus, InfoCure's alleged violation of the Georgia Securities Act in conjunction with the CDL merger survives summary judgment and constitutes a predicate act for the purpose of the Plaintiffs' Georgia RICO claim.[6]

> ### 3.   Mail Fraud

The Plaintiffs also allege that the Defendants committed mail fraud as part of a scheme to defraud the Plaintiffs.  Specifically, the Plaintiffs allege that InfoCure sent the following three documents through the United States Mail for the purpose of perpetrating securities fraud: (1) a Form D, Notice of Sale of Securities sent to the SEC; (2) a Notification Form for Listing Additional Shares sent to the NASDAQ market; and (3) a request to the American Stock Transfer & Trust Company to issue certificates representing shares of InfoCure stock to the Plaintiffs.  (See Second Am. Compl. ¶ 125.)   These three mailings, the Plaintiffs maintain, contributed to the Defendants' alleged scheme to acquire small businesses at discounted prices by misrepresenting InfoCure's financial condition.

The Defendants contend that there is no mail fraud because there is no underlying securities fraud.  Where there is no underlying fraud, there is no mail fraud.

---

[6]The Plaintiffs also allege that InfoCure's failures to register stock as promised in transactions with Robert Runde and Joseph Memminger constitute violations of the Georgia Securities Act and also serve as predicate acts for the Georgia RICO claim. As the Court finds that there remain genuine issues of material fact on two related predicate acts, the Court need not reach these additional alleged predicate acts.

<u>Prince Heaton Enters., Inc. v. Buffalo's Franchise Concepts, Inc.</u>, 117 F. Supp. 2d 1357, 1362 (N.D. Ga. 2000). As discussed previously, there remain genuine issues of material fact as to whether the Defendants committed common law fraud and violations of the Georgia Securities Act. The premise of the Defendants' argument is flawed, rendering the conclusion erroneous.

The Defendants also argue that the claim of mail fraud fails, as the Plaintiffs did not rely to their detriment on the mailings. In order to cite mail fraud as a predicate act under the Georgia RICO Act, the Plaintiffs must have been "a target of the scheme to defraud and must have relied to [their] detriment on misrepresentations made in furtherance of that scheme." <u>Pelletier v. Zweifel</u>, 921 F.2d 1465, 1499-1500 (11th Cir. 1991); <u>see also</u> <u>Byrne v. Nezhat</u>, 261 F.3d 1075, 1110 (11th Cir. 2001). The Defendants attempt to make the tenuous logical leap from the holding in <u>Pelletier</u> to the conclusion that the mailings themselves must contain the misrepresentations upon which the Plaintiffs rely. Noting that the mailings were not directed to the Plaintiffs, were not mailed prior to or contemporaneous with the merger, and did not include any fraudulent misrepresentations, the Defendants conclude that the Plaintiffs did not rely to their detriment on the mailings. But the Plaintiffs need not prove detrimental reliance *on the mailings* to establish mail fraud as a predicate act. Rather, the Plaintiffs need only demonstrate reliance and direct injury, and thereby establish standing, for a single

predicate act.  <u>Pelletier</u>, 921 F.2d at 1497; <u>Southern Intermodal Logistics, Inc. v. D.J.</u>

<u>Powers Co., Inc.</u>, 10 F. Supp. 2d 1337, 1354 (S.D. Ga. 1998) ("a Georgia civil RICO

plaintiff does not have to show injury from *every* predicate act alleged, just '*a* predicate

act'") (emphasis in original).  Moreover, the Plaintiffs need not demonstrate that the

mailings are fraudulent--the mailings need only be in furtherance of a general scheme

to defraud.  <u>See</u> <u>Schmuck v. United States</u>, 489 U.S. 705, 711 (1989); <u>Jepson, Inc. v.</u>

<u>Makita Corp.</u>, 34 F.3d 1321, 1330 (7th Cir. 1994) ("Even innocuous communications

can qualify for this purpose so long as they are incident to an essential part of the

scheme.").

  The Defendants lastly contend that the mail fraud claim fails as a predicate act

because the mailings were not, as required, incident to an essential part of the scheme

to defraud.  The Plaintiffs have described InfoCure's alleged scheme to defraud as its

acquisition of small businesses at discounted prices by misrepresenting InfoCure's

financial status.  (<u>See</u> Pls.' Opp. to Def. InfoCure & InfoCure Systems, Inc., Mot.

Summ. J. at 69.)  The Plaintiffs state that the mailings were incident to an essential part

of the securities fraud, as "InfoCure used the United States Mails to complete the

acquisitions of the target companies in furtherance of that scheme."  (<u>Id.</u>)  This Court

agrees that the mailings at issue constituted an essential part of the securities fraud.

Although the transaction could have been consummated without the mailings, the

mailings were standard conduct associated with the transfer of stock.  For example, although stock certificates are merely evidence of ownership and transfer of such certificates is not necessary to transfer of ownership, see Lynam v. Gallagher, 526 A.2d 878, 883 (Del. 1987), the mailing of stock certificates to the transferee is a relatively common practice.  As the mailings are incidental to an essential part of the Defendants' alleged scheme, the alleged acts of mail fraud may be considered predicate acts for the purposes of the Plaintiffs' RICO claim.

4.    Pattern of Racketeering Activity

It is not enough to establish that a defendant committed multiple predicate acts. To succeed on a RICO claim, a plaintiff must show that these acts are sufficiently distinct as to constitute separate incidents of racketeering activity but also sufficiently related as to constitute "a pattern of racketeering activity."  Under the Georgia RICO statute, a "pattern of racketeering activity" means:

> Engaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents. . . .

O.C.G.A. § 16-14-3(8).  InfoCure contends that the alleged violation of the Georgia Securities Act and alleged mail fraud stemming from the PRISM merger do not form a "pattern of racketeering activity" but rather constitute a single transaction.  Georgia

case law appears to support the notion that parts of a single transaction do not establish a pattern of racketeering activity.  <u>See</u> <u>Adams v. State</u>, 231 Ga. App. 279, 282 (1998); <u>Raines v. State</u>, 219 Ga. App. 893, 894 (1996); <u>Cobb v. Kennon Realty Servs., Inc.</u>, 191 Ga. App. 740, 741-42 (1989).  This Court need not, however, decide whether the related mail fraud and securities fraud predicate acts are part of a single transaction, as the Plaintiffs have identified another viable predicate act involving different victims and a different corporation.  InfoCure's acquisition of CDL is a transaction separate from but related to its merger with PRISM.  The Plaintiffs allege that in each of these transactions, the Defendants made similar warranties regarding the business and financial status of InfoCure and that the victims relied on these misrepresentations in merging their companies with InfoCure and accepting InfoCure stock at an inflated price.  InfoCure's transactions with PRISM and CDL are marked by the same methods of commission, including nearly identical warranty language, and similar alleged results.  The predicate acts, once proven, would clearly constitute a pattern of racketeering activity, as contemplated by the Georgia RICO statute.  Consequently, summary judgment on the Plaintiff's Georgia RICO claim is improper at this time.

### 5.   Endeavor to Violate RICO

In conjunction with their claims of RICO violations, the Plaintiffs allege that InfoCure endeavored to engage in a pattern of racketeering activity in violation of

O.C.G.A. § 16-14-4(c).  A claim for attempt to violate RICO requires a plaintiff to prove that a defendant (1) attempted to engage in a pattern of racketeering activity, (2) performed a "substantial act" toward the crime, and (3) failed to consummate the crime.  Brewster v. State, 261 Ga. App. 795, 798 (2003).  Here, the parties do not dispute that the transactions which form the predicate acts were successfully completed.  The parties dispute only whether the transactions were fraudulent or otherwise criminal.  As the Plaintiffs argue--and the Defendants concede--that the allegedly fraudulent acts have been successfully consummated, they cannot also contend that the Defendants "failed to consummate the crime."  Summary judgment on the Plaintiff's attempted RICO claim for the Defendants is warranted.

E.    Attorneys' Fees

The Defendants seek summary judgment on the Plaintiffs' claim for recovery of litigation expenses.  The Defendants contend that because the Plaintiffs' claims for damages fail, the Plaintiffs may not recover the expenses of their litigation.  See O.C.G.A. § 13-6-11; Connell v. Houser, 189 Ga. App. 158, 160 (1988).  This argument, of course, hinges on the faulty premise that none of the Plaintiffs' claims for damages will survive summary judgment.  As certain of the Plaintiffs' claims for damages remain, summary judgment on the Plaintiffs' claim for fees is improper at this time.

56

F.     <u>Declaratory Judgment</u>

In addition to their pecuniary claims, the Plaintiffs seek to have this Court render the Non-Competition Agreements executed in conjunction with the Merger Agreement unenforceable.  As the operative provisions of these agreements expired on December 28, 2004, this claim is moot.  Summary judgment on this claim for the Defendants is proper.

IV.  <u>CONCLUSION</u>

For the reasons set forth above, Defendants Richard E. Perlman and James K. Price's Motion for Summary Judgment [Doc. 212] is GRANTED IN PART and DENIED IN PART.  The Plaintiffs' Motion for Partial Summary Judgment [Doc. 215] is DENIED.  The Defendants InfoCure Corporation and InfoCure Systems, Inc.'s Motion for Summary Judgment [Doc. 221] is GRANTED IN PART and DENIED IN PART.

SO ORDERED, this 2 day of September, 2005.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge